ROBERTA L. JENKINS v. MARION R. JENKINS, Appellant.

In Banc, March 22, 1924.

1. **EVIDENCE: Objection Considered on Appeal: Copy of Lost Paper: Competency.** The only objection to the admission of a paper in evidence that can be considered on appeal is the objection that was made at the trial at the time it was offered in evidence; and where the only objection then made was that the paper was incompetent, irrelevant and immaterial, and it was clearly relevant and material, it was likewise competent where plaintiff testified that the original was written by defendant and by him delivered to her, that it was lost, that she had made diligent search to find it but had failed, and that the paper offered was a true copy of it.

2. ———: **Copy of Lost Paper: Equivocation: Evasion.** Where plaintiff testified that the original contract between her and defendant was written by defendant and by him delivered to her, that it was lost, that she had made diligent search and failed to find it and that the paper offered in evidence was a true copy of it, equivocal and uncandid answers by defendant when asked the direct question whether he signed and delivered the paper, such as he did not remember and knew nothing about it, carry conviction that he did sign and deliver the original and under the circumstances detailed by plaintiff.

3. **CONTRACT: Unilateral and Executory: Specific Performance.** A written paper, signed only by defendant, the sole owner of a certain manufacturing company, which does not purport to transfer to the plaintiff, named therein, a present one-half interest in the company, but is a mere promise on his part to give her a one-half interest if she will assist him in procuring money from the bank to carry on the business, is both executory and unilateral; and such a contract is not sufficient to uphold a suit by her to establish a partnership in the business unless she substantially performed

Jenkins v. Jenkins.

the contract on her part; and the signing of three small notes, which were not of material assistance in carrying on the business, was not substantial compliance.

4. **CONSTRUCTIVE TRUST**: Contribution of Money: Appropriation of Wife's Rents. A constructive trust does not arise in favor of a wife by reason of having contributed funds for the establishment of her husband's business, with the understanding, on her part, that she was to have an interest therein, where she contributed nothing, and had nothing except a farm, whose possession, rents and profits belonged to him.

Headnote 1: Appeal and Error, 3 C. J. sec. 733; Evidence, 22 C. J. sec. 1341. Headnote 3: Specific Performance, 36 Cyc. 624. Headnote 4: Trusts, 39 Cyc. 187.

Appeal from Linn Circuit Court.—*Hon. Fred Lamb,* Judge.

REVERSED.

*Scott J. Miller* for appellant.

(1) The burden of proving partnership was on the plaintiff, and the evidence was not sufficient to establish it. Gatewood v. Bolton, 48 Mo. 78. (2) There is practically no evidence of partnership in this case, unless the plaintiff's "Exhibit 8," being a pretended copy of a pretended conditional assignment, claimed to have been made in Fort Madison, Iowa, about 1891 and claimed to have been placed of record in the Recorder's Office in Lee County about ten years after its execution, can be taken as such evidence, for the testimony of plaintiff herself is the only evidence except that above mentioned that in any way tends to support her contention, and it is absolutely disputed by plaintiff, by all the other witnesses in the case, and by all the facts in evidence, and does not in any manner meet the requirements necessary to prove a partnership. (3) "Exhibit 8" is incompetent and should not have been admitted in evidence by the court and its admission was erroneous. Sec. 10568, R. S.

1919. (4) It is claimed in plaintiff's testimony that a large part of the money used by defendant in his business after 1901, came from plaintiff's farm. This being true defendant cannot be charged up with it in this case as it was his money. They were married in 1879. There were children born of the marriage. Under this state of facts defendant was entitled under his marital right and by reason of curtesy to all of the product of his wife's real estate, the marriage having occurred and children having been born prior to the Married Woman's Act of 1889. Powell v. Bowen, 214 S. W. 142.

*John H. Taylor, S. L. Sheetz, T. M. Bresnehen, H. J. West* and *E. L. Marshall* for respondent.

(1) Personal property owned by respondent at the time of her marriage was her separate property and did not belong to appellant by right of the marriage. Respondent was married to appellant on May 4, 1879. On March 25, 1875, Chapter 115 of the General Statutes of 1865 was amended by adding Section 20 thereto. This section was carried into Revised Statutes 1879 as Section 3296, and into Revised Statutes 1889 as Section 6869, and into Revised Statutes 1899 as Section 4340. Beginning with the decisions in Richardson v. Lowry, 67 Mo. 411; Mertens v. Loewenberg, 69 Mo. 208; McCoy v. Hyatt, 80 Mo. 135; Dailey v. Singer Co., 88 Mo. 305; Blair v. Chicago & Alton, 89 Mo. 390, and to this date, this section has been construed without an exception as protecting the personal property of the wife from the husband unless reduced to possession by the husband with her assent in writing. (2) Proceeds of sales of real estate belonging to respondent at the time of the marriage were her separate estate. Sec. 3296, R. S. 1879; Rogers v. Bank, 69 Mo. 560; Scrutchfield v. Sauter, 119 Mo. 615; Gordan v. Gordan, 183 Mo. 294. (3) As to property purchased by appellant in his own name with the money or means of respondent, he is the holder of the bare legal title and the entire beneficial interest is in her. Hudson v. Wright,

204 Mo. 432; Fogle v. Pindell, 248 Mo. 74-5; Jones v. Elkins, 143 Mo. 650. (4) The profits of the wife's separate property produced by the efforts of the husband belong to the wife. Sec. 7328, R. S. 1919; Sec. 3296, R. S. 1879; Seay v. Hesse, 123 Mo. 456. (5) The husband may devote his entire time to handling a business arising from the wife's separate property, but he does not thereby acquire any interest therein regardless of how profitable the business may become. Gruner v. Scholz, 154 Mo. 415. (6) The receipt of the wife's money by the husband is presumed to be for her use, and the burden is upon him to remove the presumption by evidence. Fogle v. Pindell, 248 Mo. 74. (7) A contract may be made by an offer in writing and acceptance by acts, and when performed by the offeree, a contract results. Allen v. Chouteau, 102 Mo. 323. (8) Under a prayer for general relief, this court may give respondent any relief consistent with the evidence and pleadings and affirm the judgment of the lower court, notwithstanding the reason upon which the decision of the lower could is based is not approved. Harris Banking Company v. Miller, 190 Mo. 672; Stark v. Kirchgraber, 186 Mo. 647.

RAGLAND, J.—This is a suit for the dissolution of an alleged partnership and an accounting.

Defendant and plaintiff were formerly husband and wife. They were married May 4, 1879. She had inherited from her father, who had died seven or eight years prior thereto, 720 acres of land, and she had received as her distributive share of his personal estate something like four or five thousand dollars in money and notes. At the time of her marriage she still had the land, and she had some of the money and notes on hand; just what they amounted to at that time was not definitely shown. The land or the greater part of it was located in Linn County. Three hundred and twenty acres of it constituted what had been her father's "home farm." About one hundred acres of the farm was in cultivation; the remainder was covered with timber and brush. The

303 Mo. Sup.—21.

fences and other improvements were in disrepair, and in a general way the farm was "run down." The other lands were of small value. The most of them were subsequently sold at prices which did not average more than ten dollars per acre.

At the time of his marriage defendant was a telegraph operator. Plaintiff testified that he had absolutely nothing. He claims, however, that he had "eight or nine hundred dollars in cash, a horse and buggy and some good clothes." They located in Browning, in Linn County, where he bought a livery business, paying $1500 for it. Of this amount he borrowed $700 from one Moore, his wife signing the note with him. After a few months he exchanged the livery business for a small stock of general merchandise. He then formed a partnership with one Calhoun, who was at the time engaged in the mercantile business at Browning, and they consolidated their stocks. In 1881 Calhoun and Jenkins became insolvent and attachment suits followed; they effected settlements with their creditors, but their assets were wiped out. About this time plaintiff and defendant gave a deed of trust on the 320 acres of land for $1400, to be used in paying the Moore note and a note he had given her mother for borrowed money. This deed of trust remained on the home farm until 1886, when the indebtedness was paid from the proceeds of a sale of other land. After the defendant's failure in the mercantile business he engaged in farming. Whether he and his family moved to the 320-acre farm is not disclosed by the record, but that is the farm upon which he employed his time and energies until 1889. He fenced and re-fenced it; cut off timber and brush; "carved a farm out of a wilderness," to use his language. During this period he and his wife sold from time to time parcels of her land, disposing of practically all of it except the 320 acres, which was never sold, or encumbered a second time. He received and used as he saw fit the rents and the proceeds of sales, both of lands and of farm products, without ever accounting to her in any way there-

for.  The most, if not all, of these funds were appropriated by him to the support of his family and to the making of improvements and betterments on the ''home farm.''  Considerable sums, however, according to the testimony of plaintiff, were spent for the services of attorneys through whom he was endeavoring to secure patents for certain inventions he was making to be used in the manufacture of hay rakes and stackers.

In 1889 defendant associated with him one R. L. Gibson, and another, and manufactured about sixty hay rakes and stackers, presumably according to a design for which he had obtained letters-patent.  These machines were made at Browning and sold to farmers living near there.  They were made and put on the local market largely for the purpose of testing the merits of defendant's invention.  In January, 1890, defendant, Gibson and three others formed a corporation at Fort Madison, Iowa, to manufacture and sell the Jenkins hay rakes and stackers.  The capital stock was $10,000 and each of the incorporators subscribed for one-fifth of it.  It seems, however, that but $500 was paid in by each.  The corporation, after operating for nearly two years, became insolvent and was abandoned by its stockholders.

Plaintiff testified that defendant made a sale of all personal property on the farm, just before or just after embarking in the manufacturing business at Fort Madison, from which he realized three or four thousand dollars, and that that sum and about $1400 additioned received from a sale, in 1888, of 245 acres of her land, he used in the business.

In the fall of 1891 and just after the Fort Madison fiasco defendant determined to return to Browning and go it alone in the manufacture of rakes and stackers.  It is claimed by plaintiff that at that time a contract was entered into between her and the defendant, evidenced by a written memorandum, an alleged copy of which she introduced in evidence.  It was as follows:

''In consideration that my wife, Birdie L. Jenkins, assists me in procuring money from the bank to carry on

the business I hereby agree to give her a one-half interest of all my interest in the Jenkins Hay Rake and Stacker Co. Also the undivided one-half interest in patent No. 438316 granted to me October 14, 1890, for improvements in Hay Rakes.

"M. R. JENKINS."

The paper read in evidence purported to be "a true and correct copy of a receipt filed for record April 28, 1911," in the Recorder's Office of Lee County, Iowa. It was so certified by one F. C. Chambers, who styled himself, "Recorder in and for said county." Plaintiff testified, however, that it was a true copy of the original, which she had lost and which she was unable to find after diligent search. Defendant objected to its introduction in evidence on the ground that it was "incompetent, irrelevant and immaterial."

Whether or not the alleged contract was entered into and, if so, whether it was performed by plaintiff are the vital questions in the case. The material portions of her testimony with respect to these matters are as follows:

"Q. Did you and Mr. Jenkins have any business transaction or transactions shortly before you moved from Fort Madison back to Browning? A. Yes, sir. . . . He said then we would have to borrow a lot of money; we wanted to buy the machinery and move it back to Browning and go ahead and manufacture some rakes and stackers ourselves. . . . Mr. Jenkins said we would have to borrow a lot of money, of course, to do all that, and I objected. I says, 'I put all this in and I haven't anything to show for it.' And he suggested then that he make over one-half of it to me and that was satisfactory with me. And he went off and wrote out the paper and when he brought it back it didn't state it was for money that I put in. . . . I wanted the paper to show for the property I had put in the business and not for going security for him. . . . I accepted it (the paper) that way. (That is, as it was written.) . . .

"Q. Mrs. Jenkins, did you go ahead and assist your husband in borrowing money? A. Yes, sir; I was very much encouraged when he gave me that paper. . . .

"Q. What money did he borrow? A. He borrowed different amounts and bought the machinery; he borrowed money in Ft. Madison and also in Browning. . . .

"Q. If you recall, state what notes, if any, you signed for him about that time? A. I signed a note for five hundred dollars at the Fort Madison Savings Bank, at that time, I believe it was called that, but the name of the bank has changed, and I signed a note to Captain Campbell for machinery and other things,

"A. (continuing) Then I will state another article; he bought some machinery from my brother-in-law, a boring machine, and the machinery he got from Captain Campbell was an engine and boiler—I signed notes for them. . . .

"Q. Can you give the names of any of these people to whom you gave notes? A. I secured a note in 1892, I believe it was, to C. A. Turner for three hundred and fifty dollars; that was after we moved back to Browning, and a note to my mother in 1903—I am not sure about the date of that—for four hundred and ten dollars. It was during the time Mr. Neet was in the business; that was along about 1896, I think.

"Q. Mrs. Jenkins, when you brought the factory back to Browning did you have to raise some money there with which to build these buildings? A. Yes, sir.

"Q. Where did you get that money? A. In different places. I had some paid in, some payments came in on the land and we borrowed some. . . .

"Q. At the time he went into this business, Mrs. Jenkins, did he have any money at all except what you furnished him? A. He had none.

"Q. Did he have any property? A. He had no money or no credit and he couldn't borrow a hundred dollars in the town of Browning. He tried to, but couldn't do it unless my name was on it.

"Q. Then for years after that what credit did he have? A. He hadn't any up until we came to Chillicothe.

"Q. When did you finally move the factory to Chillicothe? A. In 1909. . . .

"Q. The consideration of that paper was only to sign his notes as security and help him to get money? A. What I wanted it for was for my property—

"Q. You didn't see him write this paper? A. He wrote it there at home, I think.

"Q. You didn't see him write it? A. We had our talk there and he went out of the room and came back with the paper.

"Q. You didn't see him write it? A. No, sir.

"Q. He went out of the room and came back and you accepted it as it was? A. Yes, sir.

"Q. That says on its face that you were merely to become security for him? A. I was to assist him in procuring money to run the business.

"Q. To become security? A. Yes, sir.

"Q. Will you tell the court of a single dollar you assisted him to procure in running the business at Fort Madison; what note did you sign or pay? A. I paid some at the bank.

"Q. How much? A. I secured some at the bank.

"Q. Of course, there was a record kept of that; give me the name of the bank and just when it was? A. The bank's name at that time was the Lee County Savings Bank, or now the Ft. Madison Savings Bank; I can't tell exactly what the name of the bank was at that time.

"Q. The Lee County Savings Bank? A. It might have been.

"Q. But you didn't borrow any money from them; it might have been some other bank? A. Well, I couldn't give the name of the bank now.

"Q. Could you tell the size of the note that you went on? A. I went on one $500 note and I went on others.

"Q.   What bank was that to?   A.   I can't remember the name of the bank.

"Q.   Do you remember the time it was?   A.   Different times.

"Q.   You couldn't have gone on that note only at that time?   A.   I couldn't give the exact date of that.

. . .

"Q.   You were up there then; then the business was not run up there except as a corporation?   A.   I think they were starting up there before the business was incorporated—Mr. Gibson, Mr. Jenkins and Mr. Gray.

"Q.   And the note that you signed for them was previous to the establishment of the incorporation of the partnership?   A.   I signed some notes previous, but afterwards I signed others.   I signed another note right away after we decided to move back to Browning; that was, say, in August, 1891; along about that time I was signing notes and we were raising money."

Defendant's testimony with respect to the same subject-matter is as follows:

"Q.   Mr. Jenkins, did your wife at any time advance you money up at Ft. Madison?   A.   She did not.

"Q.   It is said by her she signed a note, but she can't remember to whom she signed it, as security?   Did she lose anything on this note if she signed one?   A. She never signed any note for this corporation at all.

"Q.   Therefore she didn't lose any money on it?   A. No, sir.

"Q.   When you came back to Browning did you borrow money from her?   A.   I did not.   I had the interest in these machines we had left over; some eight or nine.

"Q.   How long did you run at Browning before you had a fire?   A.   The shop was hardly completed.   We had only shipped one car of rakes when the fire started.

. . :

"Q.   Was that before Mr. Norman went in partners with you?   A.   Yes, sir.   I didn't have any partner then.

"Q. You owned the whole business up to that time?
A. Yes, sir.

"Q. Was it a big concern or a one-horse concern?
A. About forty by eighty was the building, a box construction.

"Q. There wasn't much money in it? A. About four hundred dollars the lumber bill.

"Q. Did you put it up yourself? A. I owed for it.

"Q. Did you owe it to Mrs. Jenkins? A. No, sir; I didn't owe her anything.

"Q. You couldn't borrow money from her, could you? A. No, she was not advancing me money for anything. . . .

"Q. Now, when you left Fort Madison, you assigned a one-half interest in the business up there to your wife? A. No, sir; she never had any half interest or any interest at all.

"Q. I will get you to look at that paper there? A. Yes; but if you have got such an instrument as that you will have to produce it. No such partnership ever existed, the conditions were never provided (complied) with, there is a proviso in there.

"Q. This is a certified copy of the instrument that you gave your wife, and it says that 'in consideration that my wife, Birdie L. Jenkins, assists me in procuring money from the bank to carry on the business I hereby agree to give her a one-half interest of all my interest in the Jenkins Hay Rake and Stacker Co., also the undivided one-half interest in patent No. 438316 granted to me October 14, 1890, for improvements in Hay Rakes.' She did assist you in getting money, this was after your corporation had dissolved up at Fort Madison? A. What is the date of it?

"Q. It is not dated. A. It is not dated. We were doing business under the corporation all the time we were at Fort Madison.

"Q. This was just before you moved back, Mr. Jenkins? A. It is not dated here.

"Q. But in fact it was shortly before you moved back? A. Yes, sir.

"Q. But you signed such a paper as that? A. I don't know that I did.

"Q. You wouldn't say that you didn't? A. I don't remember anything about a paper of that kind. Never was any kind of a contract like that.

"Q. You wouldn't say that you didn't sign it? A. I don't know anything about it.

"Q. After you came back to Browning your wife did assist you in getting money, you came direct to Browning from Fort Madison? A. Yes, but she never done anything I know about. We burned out.

"Q. Your deposition was taken before Judge Davis in the receivership case wasn't it, Mr. Jenkins? I say your deposition was taken before Judge Davis when the receivership question came up? A. I was on the witness stand.

"Q. This paper was shown to you on that occasion? A. Perhaps it was.

"Q. And I will ask you if you didn't make this answer: 'A. If that is a true copy of it, I needed $500 to complete some rakes, this corporation had gotten in debt $7000 or $8000 and I was left to pay it out; we were running short of rakes and we had to build 100 extra rakes and I needed money and she signed that note of $500 at that time at the bank as security.' Did you make that answer? A. I don't remember that I did.

"Q. This is the stenographer's notes taken on that occasion? A. Let me read that. (Witness reads the same). Yes, but there is an if there. I built some extra rakes. I built some extra rakes on my own account. If she went on any note it was a personal note, not a corporation."

In January, 1892, defendant began in a small way to manufacture rakes and stackers at Browning. In April following, his establishment was entirely destroyed by fire. He had no insurance and his financial plight seemed to be desperate. The citizens of Browning, how-

ever, were interested in the enterprise; they secured by public subscription 1500 and gave it to him to enable him to make another start with his factory. In August, 1892, he sold one-half interest in his business and patents to A. E. Norman for $2500. They thereafter operated as partners, under the name of the Jenkins Hay Rake & Stacker Company, until 1898. In 1898, Norman sold to James Neet and the new firm continued the business under the old name. On October 8, 1902, Neet sold his interest in the partnership business to defendant. The contract of sale recited: "The said party of the first part (Neet) has this day sold and transferred to the said party of the second part (Jenkins) all an undivided one-half interest in the plant and fixtures, patents and materials on hand on the manufactured goods on hand of the Jenkins Hay Rake and Stacker Co. . . . and also an undivided one-half interest in lots 17 and 18, block 9, Browning, Mo. . . . the consideration for the foregoing sale is seven thousand and five hundred dollars, two thousand of which is paid in cash, the receipt of which is hereby acknowledged, and a note due on or before January 1, 1903, to be executed for three thousand dollars to bear seven per cent interest from date if not paid when due, and a note for $2500 with Birdie L. Jenkins as surety to be executed by second party to be due on January 1, 1904, with seven per cent interest until paid." When the $2500 note was presented to plaintiff by defendant for her signature she refused to sign it unless Neet's interest was transferred to her. Her testimony as to this was as follows:

"Q. What agreement was made between you and Mr. Jenkins about Neet's interest in the business? A. Well, I wouldn't buy Mr. Neet out and go security for the amount unless the papers were made in my name.

"Q. Did you say that to Mr. Jenkins? A. Yes, sir.

"Q. What did he say in reply to that? A. He said that was agreeable and he did so.

"Q. Did he make those papers over to you? A. Yes, sir, he made a warranty deed, Mr. Neet did, to lots

seventeen and eighteen in Block 9 that had part of the foundry on it and a deed to the patent.

"Q. Assignment of the patent? A. Yes, sir, that Mr. Neet had.

"Q. Did he make any other papers to you? A. No, sir."

The evidence on the part of the defendant tended to show that, after the negotiations between Neet and Jenkins had been held up for two or three days on account of Mrs. Jenkins' refusal to sign the $2500 note, Jenkins directed Neet to make deeds to the latter's interest in the two lots (seventeen and eighteen, Block 9, Browning) and the patents to Mrs. Jenkins; this was done and she signed the note. Defendant testified that these deeds were made and delivered to plaintiff merely to secure her against loss as his surety on the $2500 note. The factory was located in part on ground leased from a railroad company and in part on said lots seventeen and eighteen. When the lots were sold later, defendant appropriated the proceeds of the sale. Neet testified that several years after he had sold his interest in the Jenkins Hay Rake & Stacker Company, a representative of the plaintiff requested him to execute a bill of sale to her for a one-half interest and that he declined to do so on the ground that he had not sold anything to her. The entire consideration for Neet's interest was.paid by defendant out of the proceeds of the business, the cash at the time of the sale and the notes subsequently as they became due.

After purchasing Neet's interest, defendant, as the Jenkins Hay Rake & Stacker Company, continued to manufacture and sell hay rakes and stackers at Browning until 1908 or 1909, when he moved the plant to Chillicothe. Land for a factory site and a cash bonus for $10,000, tendered by the citizens of Chillicothe, were instrumental in bringing about the change in location. After the relocation the Jenkins Hay Rake & Stacker Company prospered exceedingly. At the time of the trial the plant and the property in the possession of defendant, acquired

directly or indirectly with the profits of the business, were valued at from two to three hundred thousand dollars.

At the time she brought this suit, November 27, 1917, plaintiff instituted an action for divorce. Subsequently and before the trial of this cause she obtained a decree divorcing the defendant for his fault. Twelve thousand five hundred dollars was adjudged her as alimony in gross. This the defendant promptly paid.

The foregoing is in the main but a general summary of the facts disclosed by the evidence. Others will be noted in the course of the opinion.

The petition is voluminous, pleading matters of evidence in the minutest detail. The following excerpts, however, embody the gist of it, in so far as it functions as a pleading:

"That afterwards on or about the 1st day of August, 1891, being desirous of removing the said hay-rake-and-stacker factory from Fort Madison to Browning, Missouri, he requested plaintiff to assist him in borrowing money with which to pay certain debts and obligations of the factory and to sign his note as surety for such money, but the defendant having already received and appropriated large sums of money belonging to the plaintiff which he had used in building up the hay-rake-and-stacker business and being largely indebted to her, and plaintiff having no notes or other written memoranda signed by the defendant showing such indebtedness, refused to sign such note unless the defendant would make over and transfer to her a one-half interest in said business in consideration for the moneys and properties of the plaintiff which defendant had theretofore received and appropriated, and in consideration of plaintiff's money that had been put in said business and in further consideration of her signing his note as surety for the money that he was attempting to and did borrow; that after said factory was moved back to Browning, Missouri, as aforesaid, defendant continued to receive large sums of money and much personal property that belonged to plaintiff and

appropriated the same to his own use without the consent of plaintiff in writing.   . . .

"That on or about the 10th day of August, 1892, plaintiff and defendant took one Norman into the factory business with them, said Norman paying the sum of $—— for an undivided one-half interest in the factory business; that the money so paid by said Norman was put into and used in the factory business and while he was connected with the business the factory and business was owned by the plaintiff and defendant and said Norman in the following proportions: One-half by A. E. Norman, one-fourth by plaintiff and one-fourth by defendant; that on or about the 18th day of September, 1896, Norman sold his interest to James Neet; that afterwards on or about the 24th day of September, 1902, plaintiff and defendant bought out the interest of said Neet in the factory business for the sum of $2500 which was paid out of the earnings of the business; that at the time of the purchase of the interest of said Neet, defendant having since the removal of the factory from Fort Madison collected and received other large sums of money belonging to plaintiff, and having collected and received large sums of money as rents and profits from real estate belonging to plaintiff, all of which have been appropriated by defendant to his own use in the manner aforesaid, without the written consent of the plaintiff, agreed with plaintiff that she should have the half interest of Neet in said business and the same should be and become her property.   . . .

"That by reason of all the foregoing facts plaintiff is now the owner of an undivided three-fourths interest in all the property of the Jenkins Hay Rake & Stacker Company including the real estate and personal property donated by the citizens of Chillicothe, Missouri, and all of said real estate above set out so purchased with the money and proceeds of the business of the Hay Rake & Stacker Company.   . .   . .

"Wherefore, plaintiff prays the court to adjudge that plaintiff and defendant are the owners as partners of all the property real and personal of the Jenkins Hay

Rake & Stacker Company in the proportions of three-fourths to plaintiff and one-fourth to defendant; that such partnership be dissolved and a receiver appointed to wind up the partnership affairs; that she be adjudged to be the owner of an undivided three-fourths interest in all of said real estate and bank and other stock so purchased with the proceeds of the factory business and that the court will award to plaintiff such other and further relief and of such character as may be just and proper in the premises.''

The answer was essentially a general denial, pleading in addition, the alimony judgment as an adjudication of the respective rights of plaintiff and defendant in and to the property in controversy, and the ten-year Statute of Limitation.

The trial court found that plaintiff and defendant were partners, and that each was the owner of an undivided one-half of the partnership assets, which were described in detail; it adjudged dissolution of the partnership and appointed a receiver to wind up its affairs. From such judgment defendant prosecutes this appeal.

Appellant seeks a reversal of the judgment on two principal grounds: (1) that the purported copy of the alleged contract between plaintiff and defendant, whereby he was to give her a one-half interest in his business if she would assist him in procuring money to carry it on, was inadmissible in evidence; and (2) that the evidence, including that with reference to the alleged contract, was insufficient to establish the existence of the alleged, or any, partnership between plaintiff and defendant.

I. In determining whether the paper offered as a copy of the alleged contract between plaintiff and defendant was admissible in evidence, the only grounds for its exclusion that may be considered here are those that were assigned at the time it was offered, namely: that it was "incompetent, irrelevant and immaterial." Clearly it was relevant and material to the issues. Was it competent? Plaintiff had testified that the original was written by defendant and

*Lost Paper: Copy.*

by him delivered to her; that it was lost; that she had made diligent effort to find it, but had failed; and that the paper offered was a true copy of it. It is obvious that the proper foundation was laid for the admission of secondary evidence. There was no error on the part of the trial court in so ruling.

II. Defendant denied that there was ever any contract between him and plaintiff of the character of that evidenced by the paper above referred to. However, when asked the direct question, whether he signed such a paper, he did not deny it; he contented himself with saying that he did not remember, that he knew nothing about it. His answers carried with them somewhat of equivocation. They were not candid. We have no hesitation in finding that he signed and delivered the original of the paper offered in evidence, and under the circumstances detailed by plaintiff. But the contract evidenced by it was purely executory in character; it did not purport to operate as a present transfer of "one-half  .  .  . interest in the Jenkins Hay Rake and Stacker Company" and patents. It was not only executory, but it was unilateral; it was a mere promise on his part to give her a one-half interest if she assisted him in "procuring money from the bank to carry on the business." He never carried this promise into execution. So far as the evidence discloses he never at any time by word or act recognized her as having the slightest interest in the hay-rake-and-stacker business. On the contrary it was conclusively shown that both before and after the times he formed partnerships with others, and during these times, she had no voice whatever in the direction or control of the business, nor was her name in any way connected therewith. It is evident on the other hand that she herself realized at all times that she had no title to any interest in the business or assets of the Jenkins Hay Rake & Stacker Company, whatever she may have considered her equitable. rights to be. Her efforts to force the defendant to transfer to her a one-half interest when he bought Neet's interest and needed her signature to the $2500 note were

palpable. Nine years later and twenty years after she claims it was signed, she filed in the Recorder's Office of Lee County, Iowa, the paper which she makes the basis of her present claim.

It cannot be said that a constructive trust arises in plaintiff's favor by reason of having contributed funds for the development of defendant's business, with the understanding, at least on her part, that she was to have an interest therein, for the simple reason that she never contributed anything. She had no funds from which she could have made contribution had she so desired. The business was built from the ground up after the return of plaintiff and defendant to Browning in the latter part of 1891. At that time he had nothing but the raw material for the manufacture of a small number of rakes and stackers, and letters-patent for his invention; she had nothing but her 320-acre farm, the possession, rents and income of which belonged to him. [Powell v. Bowen, 214 S. W. 142; 13 R. C. L. 1049.] The notes and personal property which she had received from her father's estate and the proceeds of the lands which she had sold from time to time had long been spent. In this connection it should be borne in mind that this is not a suit to compel a general accounting by the husband for the separate property of the wife appropriated by him without her written assent. On the contrary it seeks to establish a partnership alleged to have resulted from a specific contract. And that contract did not grow out of or in any way relate to the previous appropriations by the husband of the wife's personal property. According to plaintiff's testimony she tried to secure an acknowledgment from defendant that money belonging to her had gone into his business, but he ignored her claim in that respect and conditioned his offer of an interest solely on her assisting him thereafter in procuring money from the bank.

From what has been said it must be apparent that if plaintiff has an equitable interest in the assets of the Jenkins Hay Rake & Stacker Company, it has for its basis a right on her part to have specifically performed the con-

tract she alleges was entered into between her and the defendant in 1891. Whether she has such right in its turn depends on whether she substantially performed the contract on her part, whether she assisted him "in procuring money from the bank to carry on the business." Her testimony is replete with statements that defendant had no money or credit, that she signed his notes and furnished the money used to pay them and to establish the business. Where she obtained money for such purposes is not disclosed. With respect to notes signed for defendant, between the time of the failure at Fort Madison and that of the formation of the partnership with Norman, her statements consisted for the most part of indefinite generalizations; she was able to give but three specific instances in which she signed notes; one given to a bank at Fort Madison for $500, another given to her brother-in-law for a boring machine, and a third to a Captain Campbell for an engine and boiler. Defendant on the witness stand made sweeping denials of her statements that she signed notes for him. He asserted that she persistently refused to sign his paper, and that she did nothing whatever to assist him when he was struggling to put his business on its feet. Being asked specifically whether she signed as his surety a note to a Fort Madison bank for $500, he said she never signed any note for the corporation. His answer was an evasion. It should be held that she did sign the $500 note. If it be further found that she signed the two notes for machinery, is her case for specific performance made out? We think not, for the reason that the signing of these three notes did not constitute a substantial performance of the contract on her part.

In determining whether plaintiff reasonably performed the condition of defendant's offer—rendered him assistance in procuring money to carry on the business—there are certain outstanding facts that must be taken into account.

With respect to the building and equipment that were required and the funds that were necessary, to enable the defendant to establish a factory at Browning, in January,

1892, and start it going, the evidence sheds no light. But its implications are that during the first months of that year he was struggling desperately to get together material and equipment of the meagerest character. He had hardly begun making rakes and stackers when his plant and material were wiped out by fire. The next fact disclosed by the evidence is that the citizens of Browning subscribed and donated $1500 to enable him to make another start. What the defendant did between April, 1892, the date of the fire, and August of that year, in the way of re-establishing his factory, is not shown. On the latter date, however, he sold a one-half interest in his business and patents to Norman for $2500. In accordance with the contract between them, defendant put the $2500 he had received for a half interest into the business and Norman put in a like amount. Almost immediately the business of the Jenkins Hay Rake & Stacker Company assumed the proportions of a substantial going concern. During the partnership with Neet that followed it showed every indication of prosperity. After the defendant acquired the sole ownership and control it yielded enormous dividends.

Defendant's father interested Norman in defendant's enterprise and helped negotiate the sale to him. It is patent that the defendant's sole purpose in selling Norman an interest and associating him with himself as a partner was to secure adequate funds and credit with which to carry on the business. Had plaintiff rendered defendant any substantial assistance "in procuring money from the bank to carry on the business," there would have been no occasion for selling an interest to Norman. That she rendered him such assistance is not, in our opinion, supported by evidence that is either cogent or convincing. It would not be a matter of surprise if she had not deemed it prudent to sign his notes. Signing notes for him during the first years of their married life necessitated the placing of a mortgage on her 320-acre farm, which remained unsatisfied until other land could be sold. She cannot be justly censured because she may

not have been willing to hazard her property the second time on his uncertain ventures. As a result of her prudence, if such it was, she still has her farm—freed now from his dominance and control by the decree of divorce. On the other hand there are no equities in her favor which would deprive defendant of the sole enjoyment of the fruits of his own unaided toil, industry and perseverance.

The judgment of the circuit court is reversed. All concur, except *Woodson, C. J.,* who dissents.